THE CORNELIUS.

1. Presumption of an intent to run a blockade by a vessel bound apparently to a lawful port, may be inferred from a combination of circumstances, as *ex. gr.* the suspicious character of the supercargo; the suspicious character of the master, left unexplained, though the case was open for further proof; the fact that the vessel, on her outward voyage, was in the neighborhood of the blockaded place, and within the line of the blockading vessels, by *night*, and that her return voyage was apparently timed so as to be there by night again; that the vessel (though in a leaking condition, that condition having been known to the master before he set sail), paid no attention to guns fired to bring her to, but, on the contrary, crowded on more sail and ran for the blockaded shore; and that one witness testified *in preparatorio* that the master, just before the capture, told him that he intended to run the blockade from the first.

2. Although in such cases it is a possible thing that the intention of the master may have been innocent, the court is under the necessity of acting on the presumption which arises from such conduct, and of inferring a criminal intent.

THE schooner Cornelius and her cargo were captured by the government vessel Restless, and condemned as prize of war by the District Court for the Eastern District of Pennsylvania for an attempt to run the blockade established by

our government, during the Southern rebellion, of the port of Charleston, by putting into a neighboring inlet called Bull's Bay, from which Charleston was easily to be reached. Simonson, the master and owner of the schooner, and several claimants of the cargo, appealed to this court from that decree.

The facts, as assumed by this court from the evidence, were essentially these.

The master and claimants of the cargo were citizens of the United States. The vessel had been chartered by M. H. Vandyke for a voyage from New York to *Port Royal*—a place near Charleston, but in possession of the government, and, at the moment, open to trade—and back; to be terminated at Port Royal, *at the option of the charterer.* It was pretty clear that the cargo was entirely got up by Vandyke, was partly owned by him; and the remainder, if not owned, was controlled by him. Nothing appeared as to Vandyke's residence, his place of business, his character or standing in reference to the government and the rebellion, or where he was from the time the vessel left New York, which was June 15th, until he appeared at Port Royal, October 8th; two days before the vessel set out again for *some* point from that place. And although the case was open for further proof, and Vandyke made the test-oath to his own claim, the court was left in the dark as to these particulars.

A supercargo of his selection was placed on board, who had but recently come from the States in rebellion.

The vessel cleared for Port Royal, and reached that place July 1, 1862. She passed Bull's Bay on her voyage *to* this place in the *night,* and stood off and on all night until daylight next morning, being fired at twice by the Restless, one shell reaching the schooner, and she leaving the neighborhood only when daylight and the shells of the Restless made it necessary. She remained at Port Royal without unloading until October 10th, when she cleared for New York She set off from Port Royal again at an hour which would have brought her opposite Bull's Bay *in the night;* but in consequence of her leaking a good deal, she did not come

in sight of the blockading vessels watching that inlet till daylight of the 11th. About that time she saw the Restless, who fired at her twice; the shots falling short. She took no notice of these except to crowd on more sail. Acting-master Griswold, of the navy, was then despatched in an armed boat after her. His account was as follows:

"I proceeded towards Bull's Bay with all possible speed, hoping to reach the mouth of the narrow channel by which the schooner was trying to run the blockade; but she was too fast for us; for finding that the boat gained, *she set her mainsail and gaff-topsail.* As there was a strong breeze blowing at S. S. W., she went through the water at a furious rate, the pilot evidently well acquainted with the channel. On reaching Bird's Island passage she entered it beautifully, and under all sail fairly flew through the water towards Harbor Creek; seeing which, I tried to cut her off by crossing the shoals close to the island (Bird's); but it was of no use. Suddenly, however, she took the ground, and by the time she floated again I was within a quarter of a mile of her; fired a rifle at her, *but no notice was taken of it.* She still, *under all sail,* tried to reach the main land; again she took the ground. Those on board finding that she was hard and fast, and the boat close on them, gave it up, and hoisted an American ensign in the fore-rigging, port side, union down. The captain said that the flag had been there all the morning, but we could not see it till close on her. It might have been there, however, as they could not have chosen a better place to have hidden it from us. On boarding her, I found the water up to the cabin floor; but on trying the pumps found that she could be kept free by pumping ten minutes in the hour."

The steward, in his deposition, taken *in preparatorio*, stated that, ten or fifteen minutes before the vessel ran aground, the master told him that he had intended to run the blockade from the first.

The claimants of the cargo asserted, under oath, that they had never parted with the ownership of the goods; that they were sent on an honest venture to Port Royal, which had then been opened to trade; and that they had no intention to violate the blockade, and knew of none on the part of the

master.   The master asserted, in the same way, that the bottom of his vessel became so worm-eaten, during his long stay at Port Royal, that she began to fill by the time he was fairly out to sea, and that with no intention to break the blockade he was compelled to run into Bull's Bay, and, in order to avoid expense of salvage, to beach his vessel, to save her and her cargo from sinking.   The schooner was much worm-eaten, and leaking badly at the time she was beached.   But the master had had her bottom examined, and knew her leaky condition before leaving Port Royal, though not, perhaps, the full extent of it; "completely honeycombed," said one witness; "so much so that the mystery was how the vessel could float at all."

The master, Vandyke, and the other claimants, were very explicit in their denial of any intention to violate the blockade.

Before making its decree of condemnation, the District Court submitted to two nautical experts, whom it invited to hear the case as assessors, the question, whether the facts of the voyage on which the vessel was captured were consistent with a destination in good faith from Port Royal for New York continuing without wilful deviation until the time of capture; and whether, if a wilful deviation occurred, it was under circumstances reasonably consistent with innocence of intention with reference to the blockade?   The assessors reported it as their belief, that the deviation, under both these propositions, was made by the master with a fraudulent intent to run the blockade at Bull's Bay.

*Mr. Ashton, Assistant Attorney-General, for the captors.*

1. The decree below is to be taken, *primâ facie*, as right.

Lord Langdale has said that, in an admiralty cause involving a mere question of fact, the Privy Council of England will not differ from the judge of the High Court of Admiralty and reverse his judgment, unless they can clearly come to a contrary conclusion.\*   The same rule has been acted upon

---

\* The Christina, 6 Moore's Privy Council, 381.

by this court in that class of cases; so that it may be regarded
the doctrine as well of the Supreme Court of the United
States as of the English Privy Council, that in an admiralty
cause, where the question proposed and decided below was
one simply of fact, the appellant, as Mr. Justice Grier ex-
presses it in one case, has all presumptions against him, and
the burden of proof is cast on him to prove affirmatively
some mistake made by the judge of the inferior court, in the
law or in the evidence. The decree below will not be re-
versed upon the showing that there is a theory, supported
by some evidence in the cause, on which a different decree
might have been rendered.*

That this vessel had deviated from the line of the voyage
which she was professedly pursuing, was a patent and con-
ceded fact in the case. The only question, therefore, before
the court below was, whether that deviation occurred with
a fraudulent intention, on the part of those who controlled
her navigation, to violate or evade the blockade. This was
a question of fact. If the case could have been submitted
to a jury, it would have been a question belonging to them
to decide.†

But this case is peculiarly one in which the court should
proceed upon the principle just stated. The fact was found
against the claimants, not by the court alone, but by the
experienced nautical assessors also. The duty performed
by these gentlemen was like that frequently assigned by
Lord Stowell to Trinity masters in cases involving similar
nautical considerations. The proceeding in the case of *The
Mentor*,‡ and in the case of *The Neutralctet*,§ before Lord
Stowell, was like the proceeding in the present case. The
practice is a wise one, and should be encouraged by this
court.

The nautical experts not only found the general fact, that
there was a wilful deviation, with a fraudulent intent to vio-
late the blockade, but they presented to the court a report

---

* The ship Marcellus, 1 Black, 417; The Water Witch, Id. 500.

† United States *v.* Quincy, 6 Peters, 466; Lee *v.* Lee, 8 Ib. 50.

‡ Edwards, 207.                          § 6 Robinson, 31.

containing their views on all the *facts* connected with the navigation of the vessel, which entered into the determination of the great question on which the cause depended. This court will regard those facts as *conclusively* found by the assessors; and unless it should affirmatively appear that the inference drawn from them was unwarranted, will not disturb the report.

2. It is an imperative legal presumption from the conduct of the master inside of the blockaded waters, "where the law of war was the rule of navigation," in wilfully and persistently disregarding the summons and warning of the blockading vessel, and proceeding in defiance thereof toward the enemy's coast, that the master intended to violate the blockade.

We hold the particular conduct of this vessel up as presenting in itself efficient ground of condemnation of both vessel and cargo.

We find no reported case precisely parallel to the present; no case where there were so many signs of guilty intent on which the law could fix its presumption, as in this.

The case of *The Charlotte Christine*\* was that of a neutral Danish vessel, proceeded against in August, 1805, on the ground of a breach of the blockade of the 'Seine. She was taken off Cape La Heve, which the master had made, according to his allegation, simply to get a pilot for Caen, that cape being the point where pilots usually plied for Caen. It appears that he had passed the English frigates with a signal for a pilot flying and without opposition; but by his own admission, it also appeared that he had stood in within one mile of the shore *after he had perceived a pilot-boat to be coming out to him.* The facts, also, were developed by the evidence that the captured vessel continued to approach the shore after he had been hailed by the captors and had refused to bring to on the first notice. Now, what said Sir William Scott on this case? His opinion, condemning the property, concludes as follows:

---

\* 6 Robinson, 101

"It is admitted that the master had seen the pilot-boat at twelve miles distant early in the morning; that he had hoisted a signal, and perceived the boat to be coming off. What had he to do, then, but to have waited where he was, and where he had passed the frigates, as he says, without being considered to be in a suspicious situation? Instead of this prudent and natural course of conduct, he continued to approach, and in defiance of the captor's boat, since it appears that he did not bring to until a gun was fired at him. The extreme imprudence of this behavior, and the great improbability that any person would so act but from some sinister motive, lays him under the unavoidable imputation of being engaged in an attempt to break the blockade."

*The Gute Erwartung,** decided in 1805, is a further adjudication of Sir William Scott on the same principle. The vessel in that case was captured in the same waters and while professedly engaged in the same errand—taking a pilot for Caen—as the Charlotte Christine. The Gute Erwartung was a Lubec ship, sailing from Oporto with an asserted destination to Caen, captured twenty miles from Caen, and about that distance from Havre, a blockaded port. When taken, she was steering "in a course direct to Havre, and with an intention (*not to enter Havre, as was expressly averred,* but) of going on close under the land for the purpose of taking a pilot on board to carry her to Caen." Therefore, Sir William Scott says, "if the situation of the vessel *alone* was to be considered, I should be disposed to acquiesce in this representation of his intentions, and to decree the vessel to be restored on payment of captor's expenses." But that great judge proceeds:

"There is an ulterior circumstance that presents a more unfavorable aspect, which," says he, "places her, in construction of law, in the same situation which the other vessel (the Charlotte Christine, *supra*) had actually reached," (viz., so near the enemy's coast as to expose the capturing vessel to the annoyance of the enemy's guns.) "For, the master says, 'the course

---

* 6 Robinson, 183; affirmed on appeal by the Lords Commissioners, Id Prefatory List.

in which he was steering *would* have carried him directly to Havre, and that he should have continued in that course, *though not into the port of Havre*, but that he should have gone close under the land, and have taken a pilot for Caen.' Here, then, we perceive the same intention, and in the course of being pursued to the same illegal effect. *How can this intention be considered as innocent?* It is impossible that any blockade can be maintained if such a practice is allowed; that a vessel, under a destination to a port not interdicted, shall be at liberty to pursue her course in such a manner as must draw the cruiser employed in that service under the range of the enemy's batteries. It is at all times a matter of regret that the property of innocent persons should be exposed to hazard by the mere imprudence of their master; but it is impossible to relax the principle that the employer is legally affected by the acts of his agent. I am of opinion that the master in this case had declared an unlawful purpose, and was employed in pursuing it to an unlawful act; and that the ship and cargo must be pronounced subject to condemnation."

The question in neither of these cases was as to the *de facto* innocence of intention. Conceding that it might in each case in fact have been innocent, the court condemned the vessel because the policy of the law of war required it. They were condemned by force of the rule which Lord Stowell, in another case,* thus states in his own clear diction:

"If the belligerent country has a right to impose a blockade, it must be justified in the necessary means of enforcing that right; and if a vessel could, under a pretence of going further, approach, *cy pres*, close up to the blockaded port, so as to be enabled to slip in without obstruction, it would be impossible that any blockade could be maintained. It would, I think, be no unfair rule of evidence to hold, as a presumption *de jure*, that she goes there with an intention of breaking the blockade; and if such an inference may possibly operate with severity in particular cases, where the parties are innocent in their intention, it is a severity necessarily connected with the rules of evidence, and essential to the effectual exercise of this right of war."

* The Neutralitet, 6 Robinson, 31

In *The Arthur*,* decided in 1810, this rule was again en-
forced to the condemnation of both vessel and cargo. That
American vessel was captured in the Ems, which the master
had entered, as he alleged, for the purpose of procuring a
pilot to the Yadhe.

On the authority of these cases, we affirm that it was the
duty of the Cornelius to pursue that course of conduct which,
under the existing circumstances, was natural for her to pur-
sue, and which the presence of the blockading vessel ren-
dered possible and easy—namely, to request assistance from
the Restless, a man-of-war of her own country, who was not
only present on the spot, but was actually in pursuit of her.
We affirm, further, that it was the personal moral duty of
every man on board of her, which he disregarded at the
peril of heavy liability under the criminal law of the United
States—for infringement of this blockade by any one owing
allegiance to the United States is no less an offence than
high treason—to keep as far away from the coast of South
Carolina, and as near as he could, if the vessel needed as-
sistance, to the blockading fleet; and, finally, we say that
this court is entitled, in view of the conduct of this master,
to presume, *de jure*, that he intended to violate the blockade.

3. Conceding that, under the circumstances of this case,
there is no such absolute presumption of guilty intention, as
we contend there is, under the English authorities, from the
conduct of the vessel as described, then we affirm that the
whole of the nautical evidence in the case disproves the in-
nocence of the master's intention. The facts appear in the
case as the reporter states it. We are willing that the court
decide the question upon them alone. Our argument will
stand as their reserve.

*Mr. Gillet, contra*, contended: That the decisions below
were the very matters brought here for review, and that
they were brought here in the exercise of an unquestionable
right; that to give to them the effect sought would be the

---

* Edwards, 203.

*objectio ejus cujus dissolutio petitur*, the begging of the case, and render all appeal useless.

That the principles of the English admiralty, to the extent asserted by Mr. Ashton, had never been adopted here; that it would be unwise to adopt them; that they originated in the former character of Great Britain, that of a frequent belligerent, and for some years a constant one; and that it would be impolitic that a nation like ours, whose true interests were those of a neutral—the interests of peace and commerce—should ever embrace them.

That, finally, on the facts the case was not with the captors, for that there was really no proof at all of bad intention; that, however the case might be, if Port Royal had not been open to trade, the fact that it was open, and opened by the government, who thus *invited* all persons to trade to it, changed wholly the case. Persons could hardly trade to Port Royal, where the government urged them to go, and not sometimes pass close to the blockading squadron; and it would be very unjust to make parties suffer for being thus found there. The mate's denial, Mr. Gillet argued, was as explicit as possible; not marked by any evasion or ambiguity, and should have conclusive weight in a case so obviously special.

Mr. Justice MILLER delivered the opinion of the court.

Notwithstanding the denial of the master, Vandyke, and the other claimants, of any intention to violate the blockade, we are of opinion that the vessel sailed from Port Royal with such intent, by running into Bull's Bay; from which Charleston was easily accessible.

1. There are strong reasons to believe that the vessel was started from New York on a simulated voyage to Port Royal, with intent to run the blockade before reaching that place.

The supercargo is stated to have been found in New York after a recent residence and travel through a large part of the insurrectionary region. Of Vandyke, the controller of the whole cargo, and owner of part of it, and charterer of

the vessel, nothing is known as to his residence, his place of business, his character or standing in reference to the government and the rebellion, or where he was, from the time the vessel left New York, June 15th, until his sudden appearance at Port Royal, October 8th. And although the case was open for further proof, and Vandyke makes the test oath to his own claim, we are still left in the dark as to these particulars. The vessel passed Bull's Bay on her voyage to Port Royal in the night, and stood off and on all night until daylight next morning, being fired at twice by the Restless, one shell reaching the schooner, and only leaving when daylight and the shells of the Restless made it necessary. The steward, Sanford, in his deposition taken *in preparatorio*, says that ten or fifteen minutes before the vessel ran aground, the master told him that he had intended to run the blockade from the first.

2. The circumstances which prove the intent to violate the blockade in the return voyage are still stronger.

Her voyage was again timed so as to reach the entrance to Bull's Bay in the night, but owing to her leaking condition it was about daylight when she came in sight of the blockading force. About that time she passed the Restless, was fired at from that vessel several times, paid no attention to the fire except to put on more sail, was pursued by the boats of the Restless, and was run aground and captured five or six miles inside her station. The excuse set up by the master for this conduct, is his desire to beach his vessel and save her and her cargo, because she was in a sinking condition. It is shown by the testimony of the master himself, that he had her bottom examined, and knew its condition before he left Port Royal. It can hardly be believed from his own statement on that subject, that he intended to risk her for the full voyage to New York when he started. Again, his obvious duty, and his safest course every way, was to approach the Restless, explain his condition, and ask for assistance. This duty he avoided, though he had full knowledge of the blockade, and when admonished by the shot from the Restless, he made every effort to escape by

crowding sail and running in toward the blockaded port. The excuse set up of a desire to save his vessel and cargo without subjecting her to salvage, would not be sufficient if the case stood alone on the facts connected with her voyage from Port Royal. In the language of Sir William Scott, in *The Charlotte Christine*,* although " it is a possible thing that his intention was innocent, the court is under the necessity of acting on the presumption which arises from such conduct, and of inferring a criminal intention." But when these are considered in connection with the facts already stated, tending to show an intention to run the blockade from the inception of the adventure, we entertain no reasonable doubt of the guilty purpose which carried her into Bull's Bay at the time of capture. Of course the attempt to violate the blockade was made in the interest of the cargo.

DECREE AFFIRMED.